No. 22–5487

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STATE OF OKLAHOMA, ET AL., | : | On Appeal from the |
| Plaintiffs-Appellants, | : | United States District Court |
| | : | for the Eastern District of Ken- |
| v. | : | tucky |
| UNITED STATES OF AMERICA, ET | : | |
| AL., | : | District Court Case No. |
| Defendants-Appellees. | : | 5:21-cv-104-JMH |
| | : | |
| | : | |
| | : | |
| | : | |

## BRIEF OF *AMICI CURIAE* OHIO, ALASKA, ARKANSAS, IDAHO, MIS-SISSIPPI, MONTANA, AND NEBRASKA SUPPORTING APPELLANTS

DAVE YOST
Ohio Attorney General

BENJAMIN M. FLOWERS
Solicitor General
   *Counsel of Record*
MAY MAILMAN
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, OH 43215
(614) 466-8980
bflowers@ohioAGO.gov

*Counsel for State of Ohio*

*Additional counsel listed alongside signature block*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF *AMICI* INTEREST AND SUMMARY OF ARGUMENT ....1

ARGUMENT.......................................................................................... 2

    I.    The Horse Act. ........................................................... 2

    II.    The Horse Act unconstitutionally delegates governmental power to a private actor. ..........................................................................7

        A.    The Constitution bars the delegation of governmental power to private entities. .................................................................7

        B.    The Horse Act delegates governmental power to a private entity. ....14

        C.    The District Court wrongly concluded that the Federal Trade Commission retains sufficient authority over the Private Corporation. ........................................................ 19

CONCLUSION.....................................................................................23

CERTIFICATE OF COMPLIANCE................................................. 24

CERTIFICATE OF SERVICE...........................................................25

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ................................................................. 1, 12

*Beary Landscaping, Inc. v. Costigan*,
  667 F.3d 947 (7th Cir. 2012) ................................................. 8

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ................................................................. 12, 15

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936) ............................................................. 12

*Currin v. Wallace*,
  306 U.S. 1 (1939) ....................................................... 13, 18, 20, 21

*Decker v. Nw. Env't Def. Ctr.*,
  568 U.S. 597 (2013) ............................................................ 16

*Dep't of Transp. v. Ass'n of Am. R.R.*,
  575 U.S. 43 (2015) ........................................................*passim*

*First Jersey Securities, Inc. v. Bergen*,
  605 F.2d 690 (3d Cir. 1979) ................................................. 21

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ............................................................ 8

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) ................................................. 9, 10, 11

*J.W. Hampton, Jr. & Co. v. United States*,
  276 U.S. 394 (1928) ............................................................ 11

*Kiser v. Kamdar*,
  831 F.3d 784 (6th Cir. 2016) ............................................... 20

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ........................................................ 16

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) .................................................................. 13

*Lopez v. Davis*,
    531 U.S. 230 (2001)................................................................... 19

*In re: MCP No. 165, Occupational Safety & Health Admin., Interim Final
    Rule: COVID-19 Vaccination & Testing*,
    20 F.4th 264 (6th Cir. 2021) ...................................................... 2

*Oklahoma v. United States*,
    No. 5:21-CV-104, 2022 WL 1913419 (E.D. Ky. June 3, 2022) ................... 19, 20

*Pittston Co. v. United States*,
    368 F.3d 385 (4th Cir. 2004) ............................................... 14, 18

*Plaut v. Spendthrift Farm*,
    514 U.S. 211 (1995).............................................................. 9, 15

*R. H. Johnson & Co. v. SEC*,
    198 F.2d 690 (2d Cir. 1952) ...................................................... 21

*Sorrell v. S. E. C.*,
    679 F.2d 1323 (9th Cir. 1982) ................................................... 21

*Stern v. Marshall*,
    564 U.S. 462 (2011).................................................................. 8

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940) .......................................................... 13, 18

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995) ................................................................ 18

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................ 8, 10

## Statutes and Constitutional Provisions

U.S. Const. art. I, §1 ...................................................................... 1, 7

U.S. Const. art. I, §5 ........................................................................ 10

U.S. Const. art. II, §1 ................................................................ 1, 8

U.S. Const. art. III, §1 .................................................................. 8

15 U.S.C. §78 ....................................................................... 21, 22

Pub. L. No. 116-260 (2020) ................................................... *passim*

## Other Authorities

The Federalist No. 47 (J. Madison) (Cooke ed. 1961) ............................ 8

Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327
(2002) ...................................................................................... 9

J. Story, Commentaries on the Constitution of the United States §838
(1833) .................................................................................... 10

Neomi Rao, *Administrative Collusion: How Delegation Diminishes the
Collective Congress*, 90 N.Y.U. L. Rev. 1463 (2015) ......................... 10

U.S. Anti-Doping Agency, *Independence & History* ............................ 3

## STATEMENT OF *AMICI* INTEREST AND SUMMARY OF ARGUMENT

Our founding charter vests the legislative power in Congress, and the executive power in the President. *See* U.S. Const. art. I, §1; art. II, §1. Therefore, laws violate the Constitution when they empower a private entity to wield legislative or executive authority. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935). The Horseracing Integrity and Safety Act of 2020 is one such law. *See* Pub. L. No. 116-260, §§1201–12 (2020). The Act gives a private entity—the Horseracing Integrity and Safety Authority—the power to make rules that will bind the horseracing industry, *id.*, §§1205(a)(2)(B); 1206–07, and to announce penalties for their violation, *id.*, §1205(i). The Act gives the same entity the power to enforce those rules. *Id.*, §1205(a)(1), (e), (j). And it empowers the same entity to do much of this free from government oversight. For example, while the Act gives the Federal Trade Commission a nominal power to review and approve the private entity's rules, the Act *requires* the Commission to approve rules that comport with federal law. *Id.*, §1204(c)(2). Further, the private entity may promulgate guidance regarding its rules without obtaining any approval from the Commission or any other governmental agency or actor. *Id.*, §1205(g)(1).

The *amici curiae*—the States of Ohio, Alaska, Arkansas, Idaho, Mississippi, Montana, and Nebraska—take a strong interest in this case for two reasons. First,

the unconstitutional Act interferes with the States' sovereign authority to regulate horseracing, because the rules the private entity announces preempt contrary state laws. *See id.*, §1205(b). Second, and more fundamentally, a ruling holding the Act constitutional would seriously undermine the Constitution's division of authority among the States and the three branches of the federal government. "Shortcuts in furthering preferred policies … rarely end well, and they always undermine, sometimes permanently, American vertical and horizontal separation of powers, the true mettle of the U.S. Constitution, the true long-term guardian of liberty." *In re: MCP No. 165, Occupational Safety & Health Admin., Interim Final Rule: COVID-19 Vaccination & Testing*, 20 F.4th 264, 269 (6th Cir. 2021) (Sutton, J., dissenting from denial of initial hearing *en banc*). In hopes of preventing that undermining of structural protections, the States are filing this brief.

## ARGUMENT

### I. The Horse Act.

The Horseracing Integrity and Safety Act of 2020—call it the "Horse Act"—creates a nationwide regulatory regime for horseracing. Pub. L. No. 116-260, §§1201–12 (2020). This section describes that system, which sets the stage for assessing the system's constitutionality.

***The Regulating Entities.*** The Horse Act vests authority in three distinct entities.

*First*, it vests authority in the Federal Trade Commission—a preexisting federal agency within the executive branch.  Horse Act §1202(3).

*Second*, the Horse Act creates and empowers the Horseracing Integrity and Safety Authority, which this brief calls the "Private Corporation."  The Private Corporation is a "private, independent, self-regulatory, nonprofit corporation."  *Id.*, §1203(a).  It is governed by a board of directors, none of whom are appointed by the President and confirmed by the Senate.  It houses a few standing committees, too. *Id.*, §1203(b)–(e).

*Finally*, the Horse Act vests authority in a third entity that this brief will call the "Private Consultant."  The identity of the Private Consultant is not fixed.  It can be the United States Anti-Doping Agency, an independent non-profit organization. *Id.*, §1205(e)(1)(A); *see* U.S. Anti-Doping Agency, *Independence & History*, https:// perma.cc/UJX8-U5GC.  Or it can be another "entity that is nationally recognized as being a medication regulation agency equal in qualification to the United States Anti-Doping Agency."  Horse Act §1205(e)(1)(B).

**The Regulated Parties.**  The Horse Act regulates just about anyone "engaged in the care, training, or racing" of horses.  Horse Act §1202(6).  While the Act focuses on thoroughbreds, *id.*, §1202(4), its reach can be expanded to regulate other breeds.  Specifically, if a "State racing commission or a breed governing

3

organization" asks the Private Corporation to regulate another breed of horses, and if the Private Corporation agrees, then persons "engaged in the care, training, or racing" of that breed become subject to the Horse Act. *Id.*, §1202(6); §1205(l)(1). The Horse Act gives the Private Corporation complete, unbounded discretion to approve or deny a request to regulate additional breeds.

***The Regulatory Power.*** The Horse Act vests in the Private Corporation the "independent and exclusive national authority" to regulate "all … matters" relating to "horseracing safety, performance, and antidoping and medication control." Horse Act §1205(a)(2)(B). This includes the power to write the rules, *id.*, §§1206–07, and to establish the "civil penalties" for any violation of those rules, *id.*, §1205(i). Moreover, the Private Corporation is equipped with the federal government's preemption power; the Private Corporation's rules "shall preempt any provision of State law" that governs the same subject matter. *Id.*, §1205(b).

The Horse Act endows the Private Corporation with these regulatory powers so that it can operate two federal programs, one related to anti-doping and another related to racetrack safety. *Id.*, §§1206–07. The anti-doping program is a joint venture of sorts. The Private Consultant and one of the Private Corporation's standing committees must work together to "recommend anti-doping and medication control rules." *Id.*, §1206(c)(4)(A). They also must develop a list of "permitted and

4

prohibited medications, methods, and substances." *Id.*, §1206(c)(5).  While the Horse Act establishes the baseline anti-doping rules, *id.*, §1206(g)(2), a standing committee within the Private Corporation, together with the Private Consultant, "may develop … proposed modifications to the baseline" rules, *id.*, §1206(g)(3)(A).  They can even modify the rules to make them "less stringent" than the baseline.  *Id.*, §1206(g)(3)(C).  All rules and modifications must be approved by the Private Corporation.  *See id.*, §1206(c)(4)(A); §1206(c)(5); §1206(g)(3)(B).  In approving such rules, the Private Corporation must describe the elements needed to prove a violation.  *See id.*, §1208(a).

The racetrack-safety program requires less cooperation.  The Horse Act tasks only the Private Corporation and one of its standing committees with drafting the standards.  *See id.*, §1207(c).  As with the anti-doping program, the Private Corporation must describe the elements that make up a violation of the governing standards.  *See id.*, §1208(a).

***Federal Oversight of the Regulatory Power.***  The Horse Act does not give the Federal Trade Commission any power to *write* the rules governing horseracing, or to *modify* the rules that the Private Corporation adopts.  Instead, the Commission is tasked with publishing the Private Corporation's rules in the Federal Register.  Horse Act §1204(b)(1).  Once a notice-and-comment period concludes, the

Commission "shall approve" every rule that is "consistent with" the Horse Act and the "applicable rules approved by the Commission." *Id.*, §1204(c)(2). If the Commission determines that a particular rule does not satisfy this standard of consistency, then it can disapprove the rule. It also "shall make recommendations" on how best to modify the rule. *Id.*, §1204(c). The Private Corporation can then go back to the drawing board, draft a new rule in light of the recommendations, adopt that new rule, and "resubmit for approval by the Commission." *Id.*, §1204(c)(3)(B).

Sometimes, there is no federal oversight at all. For example, the Horse Act empowers the Private Corporation to "issue guidance." *Id.*, §1205(g)(1). The Private Corporation can set forth its "interpretation of an existing rule," and it can clarify its "policy or practice with respect to the administration or enforcement of such an existing rule." *Id.*, §1205(g)(1)(A). When the Private Corporation acts pursuant to this authority, the Commission has *no power* to disapprove the guidance; the guidance "shall take effect on the date on which the guidance is submitted to the Commission." *Id.*, §1205(g)(3). Here is a second example of the Private Corporation's power to operate free from federal oversight: the Private Corporate can, without regard to what the federal government would like, declare that the Horse Act will cover breeds other than thoroughbreds. *Id.*, §1205(l)(1).

The Commission is not always required to publish the Private Corporation's rules in the Federal Register. Instead, the "Commission may adopt an interim final rule, to take effect immediately, … if the Commission finds that such a rule is necessary to protect (1) the health and safety of covered horses; or (2) the integrity of covered horses and wagering on those horseraces." *Id.*, §1204(e). This provision *does not* give the Commission power to write the rules; it creates only an exception to the notice-and-comment requirement for rules that the Private Corporation proposes.

## II.    The Horse Act unconstitutionally delegates governmental power to a private actor.

The Horse Act gives the Private Corporation the power to act as the federal government. The Private Corporation writes the rules governing horseracing, enforces those rules, and issues interpretive guidance at will. While the District Court emphasized that a federal agency will oversee the Private Corporation in some instances, that oversight is more symbolic than substantive. Because the Constitution forbids allowing private entities to exercise governmental power, the Horse Act is unconstitutional.

### A.    The Constitution bars the delegation of governmental power to private entities.

**1.** The Constitution vests distinct powers in distinct branches of government. "All legislative Powers … shall be vested in a Congress of the United States." U.S. Const. art. I, §1. "The executive Power shall be vested in a President of the United

7

States."  U.S. Const. art. II, §1.  "The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, §1.  The Framers separated these powers for good reason.  "The accumulation of all powers legislative, executive and judiciary in the same hands … may justly be pronounced the very definition of tyranny."  The Federalist No. 47, p.324 (J. Madison) (Cooke ed. 1961).  Where any two powers are united in a single person or governing body, "there can be no liberty."  *Id.*, p.325 (quotation omitted).

The branches hold these powers exclusively.  The Constitution's text "permits no delegation" of governmental power.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  No branch can authorize another branch, or itself, "to exercise power in a manner inconsistent with the Constitution."  *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 68 (2015) (Thomas, J., concurring in the judgment).  This rule is known as the nondelegation doctrine.  And it forbids the delegation of governmental authority, be it legislative, executive, or judicial in nature.  *Whitman*, 531 U.S. at 472 (legislative); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496–97 (2010) (executive); *Stern v. Marshall*, 564 U.S. 462, 482–83 (2011) (judicial).

Disputes over delegations arise most often when Congress tries to give away its power to legislate.  *See, e.g.*, *Beary Landscaping, Inc. v. Costigan*, 667 F.3d 947, 950

(7th Cir. 2012). To legislate is to "prescribe the rules by which the duties and rights of every citizen are to be regulated." *Plaut v. Spendthrift Farm*, 514 U.S. 211, 222 (1995) (quotation omitted). The legislative power is, quite literally, the power to restrict liberty *en masse*. That is why the Framers considered Congress the most dangerous branch. *See* The Federalist No. 48, p.333–34 (J. Madison). It is also why lawmaking is difficult by design. For a bill to become law, it "must win the approval of two Houses of Congress—elected at different times, by different constituencies, and for different terms in office—and either secure the President's approval or obtain enough support to override his veto." *Gundy v. United States*, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting). These hurdles deter excessive legislation, promote deliberation, protect minority rights, and ensure accountability. When the power to make the law is given to an entity other than Congress—one that need not comply with Article I's demanding processes—these protections fall away.

Take accountability, for example. The whole point of vesting the legislative power in elected representatives is to allow the People to hold responsible those who seek to constrain their liberty. "Accountability for lawmakers constitutes the sine qua non of a representative democracy." Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 374 (2002) (quotation omitted)). Indeed, accountability was so important to the Framers that they drafted the House Journal Clause, *see*

U.S. Const. art. I, §5, cl.3, the object of which "is to ensure publicity to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents," 2 J. Story, Commentaries on the Constitution of the United States §838 (1833).  When Congress empowers some other entity to make law, the accountability shifts and members of Congress can easily "avoid or at least disguise their responsibility for the consequences of the decisions" made by others, usually unelected officials in the executive branch.  Neomi Rao, *Administrative Collusion: How Delegation Diminishes the Collective Congress*, 90 N.Y.U. L. Rev. 1463, 1478 (2015) (quotation omitted).  In that scenario, "citizens cannot readily identify the source of legislation or regulation that affects their lives." *Ass'n of Am. R.R.*, 575 U.S. at 57 (Alito, J., concurring).  And if no one knows who is to blame, then the blameworthy will never be held to account and the People's liberty will wither.

All this gives rise to a bright-line rule:  the powers vested by the Constitution in a distinct branch of government cannot be delegated.

**2.** Although the Constitution "permits no delegation" of power, *Whitman*, 531 U.S. at 472, the Supreme Court has created what amounts to an exception under which Congress can delegate its legislative power.  According to the Court, "our increasingly complex society" prevents Congress from doing its job in the manner prescribed by the Constitution. *Gundy*, 139 S. Ct. at 2123 (Kagan, J., op.) (quotation

omitted). In other words, Congress needs "an ability to delegate power under broad general directives." *Id.* (quotation omitted). On this basis, the Court cuts Congress some slack. Congress, if it empowers another government actor to regulate, will not be deemed to have delegated its power as long as it sets forth "an intelligible principle to which the person or body authorized to [promulgate regulations] is directed to conform." *Id.* (quotation omitted).

The Court first invoked this "intelligible principle" test in *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). While the *words* of the test have generally remained the same over the years, its *application* has become more and more deferential. *See Ass'n of Am. R.R.*, 575 U.S. at 77–86 (Thomas, J., concurring in the judgment). As a result, it is doubtful whether the test, at least in its current form, is long for this world. *See Gundy*, 139 S. Ct. at 2130–31 (Alito, J., concurring in the judgment). It remains good law for now, however, meaning the District Court was (and this Court is) bound by it.

**3.** As the foregoing makes clear, the issue in most nondelegation cases is the proper division of power among the branches of *government*. And if *Gundy* tells us anything, it is that the Court is divided on that issue. This division disappears, however, when the question involves the division of power between the government and private entities. All agree that the Constitution vests no power in private entities.

11

So, if a private entity were to exercise any governmental power, that would be just as unconstitutional as an Article III judge exercising the executive power, or the President exercising the legislative power. *Cf. Buckley v. Valeo*, 424 U.S. 1, 123 (1976) (*per curiam*). Logically, then, no branch of government can delegate its power to a private entity. This rule is known as the private-nondelegation doctrine.

The lodestar in this area is *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). That case considered a law in which Congress purported to empower private entities to regulate the poultry industry. *See id.* at 521–23. The Court struck down the law, emphatically rejecting the proposition that "Congress could delegate its legislative authority to trade or industrial associations." *Id.* at 537. "Such a delegation of legislative power is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id.* The Court invalidated a similar law a year later in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). The law there gave certain private coal miners and producers the power to set wage-and-hour requirements. *See id.* at 310–11. The Court held the law unconstitutional. It reasoned that giving a private entity the government's regulatory power "is legislative delegation in its most obnoxious form." *Id.* at 311. No case in the nearly eighty years since *Carter* casts doubt on that holding. "When it comes to [delegating

regulatory authority] to private entities … there is not even a fig leaf of constitutional justification." *Ass'n of Am. R.R.*, 575 U.S. at 62 (Alito, J., concurring).

In sum, the Constitution flatly forbids vesting governmental power in private entities. That does not mean, however, that the federal government and private entities are forbidden from working together. To the contrary, the government can, and often does, rely on private entities. *See, e.g.*, *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 386–91 (1995). For example, Congress can recruit a private entity "to operate as an aid to" a federal agency. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). Such cooperation does not violate the private-nondelegation doctrine, provided Congress makes the federal agency the commanding regulator. The agency must be the one "making the regulation and … prescribing the conditions of its application." *Currin v. Wallace*, 306 U.S. 1, 16 (1939). A private entity can propose rules, of course, but the federal agency must not be constrained by such proposals. At the very least, Congress must make sure that the private entity's proposals are subject not only to approval and disapproval, but also to modification by the agency. *See Sunshine Anthracite*, 310 U.S. at 388. Only then can the private entity be said to "function subordinately" to the federal agency. *Id.* at 399. Thus, "Congress may employ private entities for ministerial or advisory roles, but it may not give

13

these entities governmental power over others." *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004).

**B.    The Horse Act delegates governmental power to a private entity.**

The Horse Act unconstitutionally delegates governmental power. That follows from three insights. *First*, the Private Corporation is a private entity. *Second*, the Private Corporation wields governmental power. *Third*, the Private Corporation wields the power as a principal actor—it does not perform only ministerial or advisory tasks for the federal government.

**1.** The first question is whether the Private Corporation is a private entity. It is, as the defendants concede. *See* U.S. Mot. Dismiss, R.70, PageID#609. Congress classified the Private Corporation as a private entity. Horse Act §1203(a). The Corporation's features prove the label's accuracy: the federal government owns no stock in the Corporation; Congress did not reserve a single seat for a federal officer on the Corporation's board of directors; the President cannot appoint or remove directors; and Congress is not required to fund the Corporation. *See Ass'n of Am. R.R.*, 575 U.S. at 51–53.

**2.** The next question is whether the Private Corporation wields governmental power. It does. The Horse Act orders the Private Corporation to develop and implement the anti-doping and racetrack-safety programs. *See* Horse Act §1203(a).

The Private Corporation must also write and implement the rules governing these programs, sometimes on its own and sometimes with the Private Consultant's help. *See id.*, §§1206–07. These rules, whatever they may be, pack a preemptive punch. Any "State law or regulation with respect to matters within the jurisdiction" of the Private Corporation "shall" give way. *Id.*, §1205(b). Given that the Corporation can write "the rules by which the duties and rights" of those engaged in horseracing "are to be regulated," *Plaut*, 514 U.S. at 222 (quotation omitted), it has regulatory—indeed, legislative—power.

The Private Corporation also possesses enforcement power. The Horse Act empowers the Private Corporation to enforce the rules it writes. *See, e.g.*, Horse Act §1205(a)(1), (e), (j). The Private Corporation's "enforcement power" is "exemplified by its discretionary power to seek judicial relief." *Buckley*, 424 U.S. at 138. It "may commence a civil action" in federal court "to enjoin" unlawful conduct, "enforce any civil sanctions imposed," and seek "all other relief to which [it] may be entitled." Horse Act §1205(j)(1). The power to enforce the Horse Act thus rests with the Private Corporation.

The Horse Act gives the Private Corporation yet another power: the power to interpret the rules adopted under the Horse Act. The Private Corporation "may issue guidance that sets forth an interpretation of an existing rule." Horse Act

15

§1205(g)(1)(A)(i).  This is akin to the authority that administrative agencies possess under the doctrine of *Auer* deference.  As is true of the "intelligible principle" test, the issue of *Auer* deference divides the Supreme Court.  *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).  Some of the Court's members think *Auer* ought to be retained.  *Id.* at 2408.  Others subscribe to the view that, because of *Auer*, courts have for "decades, and for no good reason, … been giving agencies the authority to say what their rules mean."  *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 616 (2013) (Scalia, J., concurring in part, dissenting in part); *accord Kisor*, 139 S. Ct. at 2425 (Gorsuch, J., concurring in the judgment); *id.* at Kavanaugh, J., concurring in the judgment).  But all should be able to agree that this authority is quintessentially governmental in nature. The Horse Act gives that governmental authority to the Private Corporation.

**3.**  The last question relates to control:  Which entity is really calling the shots, the Private Corporation or Federal Trade Commission?  The answer is the Private Corporation.

The Private Corporation's role in this regulatory regime is extensive.  It must design the regulatory programs; it must write the rules governing those programs; it must implement those rules; it must enforce those rules; and it must provide interpretive guidance to the industry.  The Commission's role, on the other hand, is minimal.  Its first involvement in the regulatory process occurs *after* the Private

Corporation has already written the rules. The Commission is tasked with publishing those rules in the Federal Register. *See* Horse Act §1204(b)(1). Afterwards, the Commission gets to "approve or disapprove" the Private Corporation's rules. *Id.*, §1204(c)(1). But that approval power is not what it seems. In fact, the Commission has *no discretion* to disapprove a rule drafted by the Private Corporation when that rule is "consistent with" the Horse Act and the rules that the Commission has already approved; in such a case, the Commission "shall approve" the rule. *Id.*, §1204(c)(2). Only when the standard of consistency is not satisfied may the Commission disapprove a rule. And only then may the Commission "make recommendations" to the Private Corporation as to a rule's substance. *Id.*, §1204(c)(3)(A).

When it comes to interpretive guidance, the Commission has no say at all. Any guidance issued by the Private Corporation takes effect the moment it is sent to the Federal Trade Commission. *Id.*, §1205(g)(3). The Commission also has no role in deciding whether to regulate more breeds of horses—the Private Corporation does that by itself. *Id.*, §1205(l)(1). As for enforcement, the Commission can review civil sanctions that are imposed by the Private Corporation. *Id.*, §1209(b)–(c). But the Commission has no ability to review or stop the Private Corporation's decision to "commence a civil action" in federal court. *See id.*, §1205(j)(1).

17

The Horse Act creates an imbalance of power, and it gives the lion's share to the Private Corporation. This delegation of power undermines the Constitution. Remember the importance of accountability. Under the Horse Act, the People have *no power* to hold the Private Corporation to account. The People have no say, even indirectly, in who runs the Corporation: they cannot elect anyone to the Private Corporation's board of directors, and the People's elected representatives similarly have no authority to confirm, remove, or even manage those who sit on the board. It is thus the will of the Private Corporation that binds the People. The Constitution tolerates no such thing. In America, the People are sovereign, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 821 (1995), not Congress, not the President, and certainly not some private entity.

The Horse Act is also contrary to binding precedent. When Congress directs a private entity to assist a federal agency, Congress must make the federal agency the commanding regulator. Congress failed to do that here. The Commission is not the one "making the regulation and … prescribing the conditions of its application." *Currin*, 306 U.S. at 16. In terms of policymaking, then, the Private Corporation does not "function subordinately" to the Commission. *Sunshine Anthracite*, 310 U.S. at 399. The Private Corporation is chief policymaker, and that role cannot fairly be labeled ministerial or advisory. *See Pittston*, 368 F.3d at 395.

**C.** **The District Court wrongly concluded that the Federal Trade Commission retains sufficient authority over the Private Corporation.**

The District Court upheld the Act's constitutionality because it determined that the Private Corporation serves only a ministerial or advisory rule. More precisely, it determined that "the power to approve, disapprove, or recommend modification subject to continued rejection ensures that the Authority still 'functions subordinately' to the FTC such that the FTC 'determines' the binding rules." *Oklahoma v. United States*, No. 5:21-CV-104, 2022 WL 1913419, at *8 (E.D. Ky. June 3, 2022) (quoting *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-CV-071, 2022 WL 982464, at *23 (N.D. Tex. Mar. 31, 2022)).

The District Court erred. For one thing, it minimized the relevant text of the Horse Act. Remember, the statute *compels* the Commission to approve *every rule* the Private Corporation promulgates, as long as the rule "is consistent with" the Horse Act and the "applicable rules approved by the Commission." Horse Act §1204(c)(2). If a rule meets this consistency standard, the Commission has no authority to reject the rule; it "shall approve" it. *Id.* The word "shall," in this context at least, is mandatory rather than permissive. That is especially clear from the Horse Act's use of "may" in other provisions. *See, e.g.*, *id.*, §1204(c)(3)(B), (e); *accord Lopez v. Davis*, 531 U.S. 230, 241 (2001). So it is simply not true that Congress gave

19

the Commission the power "to control what becomes a binding rule." *Oklahoma*, 2022 WL 1913419, at *8. The District Court overlooked the "significant difference between actually delegating" regulatory power, which is forbidden, and "enacting a regulation that happens to be based on" a private entity's proposals, which is not. *Kiser v. Kamdar*, 831 F.3d 784, 792 (6th Cir. 2016).

The District Court's holding also rests on a misunderstanding of precedent. It recognized that Supreme Court case law forbids Congress from delegating governmental authority to private entities. And it seemingly recognized that the Commission lacked any authority to modify the Private Corporation's rules. But it concluded, based on its reading of *Currin* and the D.C. Circuit's decision in *Association of American Railroads*—that the absence of any power to modify the Corporation's rules was legally irrelevant. *Oklahoma*, 2022 WL 1913419, at *8 (citing *Currin*, 306 U.S. at 16, and *Assoc. of Am. R.R. v. Dep't of Transp.*, 896 F.3d 539, 545 (D.C. Cir. 2018)). The court erred. Those cases explain only that agencies may themselves propose regulations, including modifications, subject to private-actor approval. They do not discuss the converse situation, in which a private corporation drafts regulations that agencies lack the power to modify.

Consider *Currin*. That case, in examining a statute requiring two-thirds of farmers to approve a federal regulation before it became effective, explained that

Congress retained the power of the pen; Congress was the entity "making the regulation and … prescribing the conditions of its application." *Id.* at 16.  The Court compared the private-actor vote to a timing provision. *Id.*  The legislative power had already been exercised and Congress could permissibly condition "when its exercise of the legislative power should become effective" on a popular vote. *Id.* at 16.

Unlike the statute at issue in *Currin*, the Horse Act gives the power of the pen to a private entity.  Sections 1205 and 1206 of the Act set forth, in detail, the Private Corporation's duty to write the rules governing horseracing nationwide.  And the Commission, for its part, has no authority to write the rules at all.  Therefore, whatever rules are eventually embodies reflect the Private Corporation's policies, not the Commission's.

The District Court analogized the Horse Act to the Maloney Act, which other courts have upheld against non-delegation challenges. *See, e.g.*, *Sorrell v. S. E. C.*, 679 F.2d 1323, 1325 (9th Cir. 1982); *First Jersey Securities, Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *R. H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952).  The Maloney Act says that the Securities and Exchange Commission "shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this chapter." 15 U.S.C. §78s(b)(2)(C)(i).  But the Maloney Act and the Horse Act are not analogous.  The

reason is that, under the Maloney Act, the Securities and Exchange Commission re-tains the power to "abrogate, add to, and delete from … the rules of a self-regulatory organization … as the Commission deems necessary or appropriate." *Id*. at §78(c). In other words, the Maloney Act ensures that the government retains the modifica-tion authority that the Horse Act surrenders. As noted, the surrendering of that au-thority is what gives rise to the constitutional problems.

Finally, the District Court completely ignored the fact that the Horse Act au-thorizes the Private Corporation to issue guidance without *any* federal supervision. The Commission cannot approve or disapprove that guidance. *See* Horse Act §1205(g). That alone renders the Horse Act unconstitutional.

## CONCLUSION

The Horse Act vests in the Private Corporation the power to regulate horseracing across the nation. That is unconstitutional, and this Court should say so.

TREG R. TAYLOR
Alaska Attorney General

LESLIE RUTLEDGE
Arkansas Attorney General

LAWRENCE G. WASDEN
Idaho Attorney General

LYNN FITCH
Mississippi Attorney General

AUSTIN KNUDSEN
Montana Attorney General

DOUGLAS J. PETERSON
Nebraska Attorney General

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS*
  *Counsel of Record*
Solicitor General
MAY MAILMAN
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
bflowers@ohioago.gov

*Counsel for the State of Ohio*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements and contains 4,982 words.  *See* Fed. R. App. P. 29(a)(5), 32(a)(7).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

<u>/s/  Benjamin M. Flowers</u>
Benjamin M. Flowers
Ohio Solicitor General

24

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2022, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/  Benjamin M. Flowers
Benjamin M. Flowers
Ohio Solicitor General