RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0035p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STATE OF OKLAHOMA; OKLAHOMA HORSE RACING COMMISSION;
TULSA COUNTY PUBLIC FACILITIES AUTHORITY, dba Fair Meadows
Racing and Sports Bar; STATE OF WEST VIRGINIA; WEST VIRGINIA
RACING COMMISSION; HANOVER SHOE FARMS, INC.; OKLAHOMA
QUARTER HORSE RACING ASSOCIATION; GLOBAL GAMING RP,
LLC, dba Remington Park; WILL ROGERS DOWNS, LLC; UNITED
STATES TROTTING ASSOCIATION; STATE OF LOUISIANA,

> No. 22-5487

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA; HORSERACING INTEGRITY AND
SAFETY AUTHORITY, INC.; LEONARD S. COLEMAN, JR.; NANCY M.
COX; FEDERAL TRADE COMMISSION; REBECCA KELLY SLAUGHTER,
in her official capacity as Acting Chair of the Federal Trade
Commission; NOAH JOSHUA PHILLIPS, in his official capacity as
Commissioner of the Federal Trade Commission; ALVARO
BEDOYA, in his official capacity as Commissioner of the Federal
Trade Commission; CHRISTINE S. WILSON, in her official capacity
as Commissioner of the Federal Trade Commission; STEVE
BESHEAR; ADOLPHO A. BIRCH, JR.; ELLEN MCCLAIN; CHARLES P.
SCHEELER; JOSEPH DEFRANCIS; SUSAN STOVER; BILL THOMASON;
D.G. VAN CLIEF; LINA KHAN,

*Defendants-Appellees*.

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:21-cv-00104—Joseph M. Hood, District Judge.

Argued:  December 7, 2022

Decided and Filed:  March 3, 2023

Before:  SUTTON, Chief Judge; COLE and GRIFFIN, Circuit Judges.

————————

## COUNSEL

**ARGUED:** Matthew D. McGill, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellants. Courtney L. Dixon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Pratik A. Shah, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Horseracing Authority Appellees. **ON BRIEF:** Matthew D. McGill, Lochlan F. Shelfer, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., Zach West, Bryan Cleveland, OFFICE OF THE OKLAHOMA ATTORNEY GENERAL, Oklahoma City, Oklahoma, Lindsay S. See, OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL, Charleston, West Virginia, Joseph Bocock, BOCOCK LAW PLLC, Oklahoma City, Oklahoma, Todd Hembree, CHEROKEE NATION BUSINESS, Catoosa, Oklahoma, Elizabeth B. Murrill, LOUISIANA DEPARTMENT OF JUSTICE, Baton Rouge, Louisiana, Michael Burrage, WHITTEN BURRAGE, Oklahoma City, Oklahoma, Jared C. Easterling, GREEN LAW FIRM PC, Ada, Oklahoma, for Appellants. Courtney L. Dixon, Joseph F. Busa, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Pratik A. Shah, Lide E. Paterno, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., John C. Roach, RANSDELL ROACH & ROYSE, Lexington, Kentucky, for Horseracing Authority Appellees. Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Paul E. Salamanca, Lexington, Kentucky, April A. Wimberg, DENTONS BINGHAM GREENEBAUM LLP, Louisville, Kentucky, Gregory G. Garre, Blake E. Stafford, LATHAM & WATKINS LLP, Washington, D.C., for Amici Curiae.

SUTTON, C.J., delivered the opinion of the court in which GRIFFIN and COLE, JJ., joined. COLE, J. (pp. 20–31), delivered a separate concurring opinion.

————————

## OPINION

————————

SUTTON, Chief Judge. Sometimes government works. In 2020, when Congress enacted the Horseracing Safety and Integrity Act to create a national framework to regulate thoroughbred horseracing, it generated several non-delegation and anti-commandeering challenges to the validity of the Act. The lead challenge—the non-delegation challenge—turned on the reality that the Act replaced several state regulatory authorities with a private corporation, the Horseracing Authority, which became the Act's primary rule-maker and which was not subordinate to the relevant public agency, the Federal Trade Commission, in critical ways. The Fifth Circuit declared the Act unconstitutional because it gave "a private entity the last word" on federal law.

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872, 888–89 (5th Cir. 2022).

In response, Congress amended the Act to give the Federal Trade Commission discretion to "abrogate, add to, and modify" any rules that bind the industry. Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022). The Constitution anticipates, though it does not require, constructive exchanges between Congress and the federal courts. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (explaining that "interdependence" and "reciprocity" should characterize the relationship between the branches as much as "separateness" and "autonomy"). A productive dialogue occurred in this instance, and it ameliorated the concerns underlying the non-delegation challenge. As amended, the Horseracing Act gives the FTC the final say over implementation of the Act relative to the Horseracing Authority, allowing us to uphold the Act as constitutional in the face of this non-delegation challenge as well as the anti-commandeering challenge.

## I.

Unlike other sports, no one authority traditionally has regulated horseracing. Instead, 38 state regulatory schemes have supplied an array of protocols and safety requirements. Kjirsten Lee, *Transgressing Trainers and Enhanced Equines*, 11 J. Animal & Nat. Res. L. 23, 26 (2015). Most Americans know horseracing through occasional high-visibility races, say the Kentucky Derby on the first Saturday of May, or high-visibility books, say *Seabiscuit*. But as the partly and fully initiated alike can appreciate, the sport comes with risk. Racing a dozen or more jockeys atop large horses around a mile or more track, all with prize money and gambling positions at stake, creates plenty of danger. Over the last seventy years or so, fatal accidents for jockeys during horseraces have exceeded that of drivers in NASCAR races. Peta L. Hitchens *et al.*, *Jockey Falls, Injuries, and Fatalities Associated with Thoroughbred and Quarter Horse Racing in California 2007–2011*, at 3, Orthopedic J. Sports Med. (2013) (129 jockeys killed between 1940 and 2012); *How Many NASCAR Drivers Have Died Racing?*, Motor Racing Sports, https://tinyurl.com/2d3xnazy (last visited Feb. 6, 2023) (82 NASCAR drivers killed between 1950 and 2021). Faring no better, almost 500 thoroughbreds died in 2018 alone due to

racing injuries.  *Why Horse Racing Is So Dangerous*, Nat'l Geographic (Jan. 21, 2020), https://tinyurl.com/ycyf5rhv.

Whether it's the risk of pushing horses past their limits or the risks associated with unsafe tracks and doping, or other health and safety issues facing horses and jockeys, no one doubts the imperative for oversight.  The question, as is so often the case, is whether the regulation should be national or local.

In 2020, Congress answered national but did so in conventional and unconventional ways.  Conventionally, it enacted the Horseracing Integrity and Safety Act to nationalize regulatory authority over thoroughbred racing.  15 U.S.C. §§ 3051–60.  Less conventionally, it chose to use a private nonprofit corporation—the Horseracing Integrity and Safety Authority—to do some of the regulating.

The Act charges the Horseracing Authority with "developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program."  *Id.* § 3052(a).  The Authority's jurisdiction also includes the "safety, welfare, and integrity" of covered thoroughbreds, jockeys, and horseraces.  *Id.* § 3054(a)(2)(A).  The Authority may expand the Act's coverage to other breeds upon request by a state racing commission or a breed governing organization.  *Id.* § 3054(*l*).

The Horseracing Authority funds its operations through fees on the horseracing industry.  Each year, it calculates its budget and apportions amounts owed by each State.  *Id.* § 3052(f)(1)(C).  The States have two options.  They may collect the fees themselves from covered entities and remit the fees to the Authority.  *Id.* § 3052(f)(2)(D).  Or they may allow the Authority to collect the fees directly.  *Id.* § 3052(f)(3)(A)–(C).

The Act empowers the Horseracing Authority to promulgate rules on a variety of subjects:  prohibited medications, laboratory protocols and accreditation, racetrack standards and protocols, injury analysis, enforcement, and fee assessments.  *Id.* § 3053(a).  The Authority also develops procedures for its investigatory and subpoena powers.  *Id.* § 3054(c).  Once issued, the rules preempt state law.  *Id.* § 3054(b).

The Horseracing Authority implements the rules, monitors compliance, and investigates potential rule infractions. *Id.* § 3054(c), (h), (i). The Act directs "the Authority and Federal or State law enforcement authorities" to "cooperate and share information" whenever a covered person may have violated federal or state law in addition to one of the Authority's rules. *Id.* § 3060(b). After investigating, the Authority may enforce the rules through internal adjudications or civil lawsuits. *Id.* §§ 3054(j), 3057(c).

Under the Horseracing Act as originally passed, the Federal Trade Commission played a limited role. The FTC published the Authority's proposed rules for public comment. *Id.* § 3053(b)(1). After the comment period, the FTC had to approve the rules if they were "consistent" with the Act and with other "applicable rules approved by the Commission." *Id.* § 3053(b)–(c). The FTC also could issue an "interim" rule if it had "good cause" to do so and if the rule was "necessary to protect" the welfare of horses or the integrity of the sport. *Id.* § 3053(e) (2020); *see* 5 U.S.C. § 553(b)(B).

This framework prompted legal challenges. In a case filed in federal court in Texas, several claimants argued that the Act violated the Constitution by delegating unmonitored lawmaking power to a private entity. The Fifth Circuit agreed, reasoning that the FTC's oversight was insufficient because the FTC could not modify the rules or otherwise question the Horseracing Authority's policy choices. *Black*, 53 F.4th at 872–73, 886–87. Our court faced a similar challenge. Oklahoma, West Virginia, Louisiana, their racing commissions, and other entities (collectively, Oklahoma) claimed that the Act unlawfully delegated federal power to a private entity and unlawfully commandeered the States. The district court dismissed Oklahoma's claims.

After the Fifth Circuit issued its decision and after we heard oral argument in our case, Congress enacted, and the President signed into law, an amendment to the Act that increased the FTC's oversight role. The amendment eliminated the FTC's interim-rule authority and instead gave sweeping power to the FTC to create rules that "abrogate, add to, and modify the rules of the Authority." 15 U.S.C. § 3503(e) (as amended). Oklahoma maintains that the Act remains unconstitutional.

## II.

*Mootness.* First things first: Does the amendment to the Act transform this live controversy into a moot one? When Congress amends a statute, it is true, pending claims challenging the law sometimes become moot. *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). Not invariably, however. If the revised statute continues to place a non-trivial burden on the plaintiff that arises from the same theory of unconstitutionality set forth in the complaint, the case remains live. *Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 692–93 (6th Cir. 2022). A similar conclusion applies if the amendment does not affect other features of the challenge. Both exceptions apply here.

The amendment to § 3053(e) of the Horseracing Act does not moot Oklahoma's non-delegation claim. While significant to the outcome of the case, this singular amendment changes little about the Act's basic structure. The revised Act "operates in the same fundamental ways," with the Authority proposing and enforcing rules and with the FTC overseeing all of them, the key difference being that the FTC has far more oversight authority than it had before. *Id.* at 693. The revised Act likewise presents fundamentally the "same controversy," with Oklahoma continuing to argue that the Act gives too much unsubordinated power to a private entity. *Id.*; *see Cam I, Inc. v. Louisville/Jefferson Cnty. Metro Gov't*, 460 F.3d 717, 720 (6th Cir. 2006). Nor does the Act moot Oklahoma's anti-commandeering claim. In reality, the amendment does not change that dispute in any material way.

*Remand.* One other preliminary point remains. If the legislature changes a law while a live challenge to it remains on appeal, appellate courts may remand the case for the district court to take the first look at the revised law. *Hadix v. Johnson*, 144 F.3d 925, 934 (6th Cir. 1998), *abrogated on other grounds*, 530 U.S. 327 (2000). The option is discretionary, not mandatory. In this instance, we see "little to be gained" from a remand because Oklahoma brings facial challenges that raise only legal issues and because the parties and panel have already devoted considerable time and resources to the dispute. *Id.* at 935; *see Phelps-Roper v. Troutman*, 712 F.3d 412, 417 (8th Cir. 2013) (per curiam). Fortifying this conclusion is the reality that the challengers have asked us to proceed to the merits.

### III.

### A.

*Non-delegation.*    Through the United States Constitution, the People separated the powers of the National Government into three branches.    They vested the legislative power in Congress, the executive in the President, and the judicial in the federal courts.    U.S. Const. art. I, § 1; *id.* art. II, § 1; *id.* art. III, § 1.    The People also constrained each branch's use of its power through counterweights in the other branches.    To preserve this balance, the Constitution bars further delegations of power between the branches.    *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

What about delegations to private entities?    Surely, if the Vesting Clauses bar the three branches from exchanging powers among themselves, those Clauses bar unchecked reassignments of power to a non-federal entity.    Just as it is a central tenet of liberty that the government may not permit a private person to take property from another private person, *Calder v. Bull*, 3 U.S. (Dall.) 386, 388–89 (1798) (Chase, J.), or allow private individuals to regulate other private individuals, *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 122 (1928), it follows that the government may not empower a private entity to exercise unchecked legislative or executive power.    Those who govern the People must be accountable to the People.    Completely transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable undercuts representative government at every turn.

Precedent confirms that unchecked delegations to private entities at a minimum violate core separation-of-power guarantees.    Consider *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).    A federal statute gave the President discretion to create codes of fair competition based on proposals from private entities.    *Id.* at 542.    Rejecting the government's view that private participation cured any surplus delegation to the President, the Court explained that transforming private groups into legislatures was "utterly inconsistent" with the constitutional design.    *Id.* at 537.

The Court applied the same standard to the Bituminous Coal Act.  In *Carter v. Carter Coal Co.*, the Court concluded that, by empowering coal producers to set wages and to control the businesses of others, the Act amounted to a "delegation in its most obnoxious form" because such regulation "is necessarily a governmental function."  298 U.S. 238, 310–11 (1936).  Appreciating the problem, Congress amended the Act the next year to give the Coal Commission, a government entity, the power to set prices.  *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940).  After Congress subordinated the private coal producers to a public body (the Coal Commission) that could modify or reject their proposals, the Court determined that the statute did not impermissibly delegate "legislative authority to the industry." *Id.* at 399.

Taken together, these cases draw a line between impermissible delegation of unchecked lawmaking power to private entities and permissible participation by private entities in developing government standards and rules.  *Adkins* shows that a private entity may aid a public federal entity that retains authority over the implementation of federal law.  *Id.* at 388.  But if a private entity creates the law or retains full discretion over any regulations, *Carter Coal* and *Schechter* tell us the answer:  that it is an unconstitutional exercise of federal power.  *See Carter Coal*, 298 U.S. at 311; *Schechter*, 295 U.S. at 537.

Decisions from the courts of appeals hold this line.  Private entities may serve as advisors that propose regulations.  *See Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974); *Cospito v. Heckler*, 742 F.2d 72, 87–89 (3d Cir. 1984); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977).  And they may undertake ministerial functions, such as fee collection.  *See Pittston Co. v. United States*, 368 F.3d 385, 395–97 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128–29 (3d Cir. 1989), *abrogated on other grounds*, 521 U.S. 457 (1997).  But a private entity may not be the principal decisionmaker in the use of federal power, *Pittston Co.*, 368 F.3d at 395–97, may not create federal law, *Texas v. Rettig*, 987 F.3d 518, 533 (5th Cir. 2021), may not wield equal power with a federal agency, *Ass'n of Am. R.R. v. U.S. Dep't of Transp.* (*Amtrak I*), 721 F.3d 666, 671–73 (D.C. Cir. 2013), *vacated on other grounds*, 575 U.S. 43 (2015), or regulate unilaterally, *Black*, 54 F.4th at 872.

An illuminating example comes from securities law.  The Securities and Exchange Commission regulates the securities industry with the assistance of private, self-regulatory organizations called SROs.  The SROs propose rules for the industry, and they initially enforce the rules through internal adjudication.  The SEC oversees both the rulemaking and the enforcement.  As to the rules, the SEC approves proposed rules if they are consistent with the Maloney Act, and may "abrogate, add to, and delete from" an SRO's rules "as the Commission deems necessary or appropriate."  15 U.S.C. § 78s(b)(2)(C), (c).  As to enforcement, the SEC applies fresh review to the SRO's decisions and actions.  *Id.* § 78s(e); *see Sartain v. SEC*, 601 F.2d 1366, 1369–71 (9th Cir. 1979).  In case after case, the courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors.  *See R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *Todd & Co.*, 557 F.2d at 1012–13; *First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *see also Amtrak I*, 721 F.3d at 671 n.5 (describing the SROs' role as "purely advisory or ministerial").

These sources all suggest that, at a minimum, a private entity must be subordinate to a federal actor in order to withstand a non-delegation challenge.  Whether subordination always suffices to withstand a challenge raises complex separation of powers questions.  Simplifying matters for today, if not for a future day, the parties accept this framing of the appeal.  As the case comes to us, then, the determinative question is whether the Horseracing Authority is inferior to the FTC.

B.

The Horseracing Authority is subordinate to the agency.  The Authority wields materially different power from the FTC, yields to FTC supervision, and lacks the final say over the content and enforcement of the law—all tried and true hallmarks of an inferior body.

*Rulemaking.*  As amended, the Horseracing Act gives the FTC supervision over the rules that govern the horseracing industry.  At the outset, the Horseracing Authority drafts rules on racetrack safety and anti-doping matters, and the FTC must approve those proposals if they are consistent with the Act.  15 U.S.C. § 3053(c)(2).  But, critically, as the FTC "deems necessary or

appropriate," it "may abrogate, add to, and modify the rules." *Id.* § 3053(e) (as amended). The FTC's power to abrogate and change the Authority's rules creates "a clear hierarchy." *Black*, 53 F.4th at 888–89.

Section 3053(e)'s amended text grants the FTC a comprehensive oversight role. The Act provides that the FTC may act as it "finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this Act and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this Act." 15 U.S.C. § 3053(e) (as amended). The final catchall indicates that § 3053(e) spans the Horseracing Authority's jurisdiction. The parties are one in agreeing that this section allows the FTC to modify rules "if it wishes." Appellants' Suppl. Br. 1.

A comparison with § 3053(e)'s pre-amendment language reenforces the point. Before the amendment, § 3053(e) allowed the FTC to adopt interim rules only if "necessary," and only if good cause existed to bypass the Administrative Procedure Act's notice and comment procedures. 15 U.S.C. § 3053(e) (2020). The Fifth Circuit concluded that the ability to "make temporary rules on a break-glass-in-case-of-an-emergency basis" did not give the FTC sufficient control. *Black*, 53 F.4th at 883. The FTC could overrule the Authority only in rare, extreme cases, making it the inferior, not the superior, rule-maker. The amended section, by contrast, requires no emergency, no good cause, no necessity. The FTC now may create new rules or modify existing rules as it deems "appropriate to" advance "the purposes of [the] Act." 15 U.S.C. § 3053(e) (as amended). That amounts to true oversight authority.

With § 3053(e)'s broad power to write and rewrite the rules comes policymaking discretion. *See Cospito*, 742 F.2d at 88–89. When the FTC decides to act—whether by abrogating one of the Horseracing Authority's rules or introducing its own—the FTC makes a policy choice and necessarily scrutinizes the Authority's policies. That is no less true when the FTC decides *not* to act. In either setting, the FTC may "unilaterally change regulations," *Amtrak I*, 721 F.3d at 671, and "is free to prescribe" the rules, showing that it "retains ultimate authority," *Cospito*, 742 F.2d at 88. In a recent rule, the FTC recognized as much, explaining that its new "rulemaking power" allows it to "exercise its own policy choices."

*Order Ratifying Previous Commission Orders* 3, Fed. Trade Comm'n (Jan. 3, 2023), https://tinyurl.com/dkenwspt.

In full, § 3053(e)'s amended text gives the FTC ultimate discretion over the content of the rules that govern the horseracing industry and the Horseracing Authority's implementation of those rules. By the same token, ultimate "law-making is not entrusted to the [Authority]." *Adkins*, 310 U.S. at 399; *see Frame*, 885 F.2d at 1129. That makes the FTC the primary rule-maker, and leaves the Authority as the secondary, the inferior, the subordinate one. *See Adkins*, 310 U.S. at 388.

Accountability considerations lead to the same destination. Before the amendment, the Fifth Circuit determined that the FTC could not question the Horseracing Authority's policy choices or modify its rules. *Black*, 53 F.4th at 886–87. It followed that the Authority, a private entity beyond public control, alone was responsible for the exercise of government power in this area. Not so anymore. With its new ability to have "the final word on the substance of the rules," the FTC bears ultimate responsibility. *Id.* at 887; *cf. Lynn*, 502 F.2d at 59. The People may rightly blame or praise the FTC for how adroitly (or, let's hope not, ineptly) it "ensure[s] the fair administration of the Authority" and advances "the purposes of [the] Act." 15 U.S.C. § 3053(e) (as amended).

*Enforcement.* A similar conclusion applies to enforcement of the Act. The Horseracing Authority's enforcement duties are extensive, granted. The Authority implements the Act, investigates potential rule violations, and enforces the rules through internal adjudications and external civil lawsuits. Even so, the FTC's rulemaking and rule revision power gives it "pervasive" oversight and control of the Authority's enforcement activities, just as it does in the rulemaking context. *Adkins*, 310 U.S. at 388.

Take an example to illustrate the point. Imagine that the Horseracing Authority began enforcing its rule without giving thought to the procedural rights of jockeys, trainers, and other industry participants. Section 3053(e) gives the FTC the tools to step in. To ensure a fair enforcement process, the FTC could issue rules protecting covered persons from overbroad subpoenas or onerous searches. The FTC could require that the Authority provide a suspect with

a full adversary proceeding and with free counsel.  And the FTC could require that the Authority meet a burden of production before bringing a lawsuit or preclear the decision with the FTC.  In these ways as well as others, the FTC may control the Authority's enforcement activities and ensure that the FTC, not the Authority, ultimately decides how the Act is enforced.

Topping this oversight off, the FTC has full authority to review the Horseracing Authority's enforcement actions.  15 U.S.C. § 3058(c)(1)–(2).  After an independent review, the FTC may reverse the Authority's decision.  *Id.* § 3058(c)(3).  As with rulemaking, so with adjudication:  The Authority's adjudication decisions are not final until the FTC has the opportunity to review them.  *See Cospito*, 742 F.2d at 88; *Todd & Co.*, 557 F.2d at 1012–14.  All told, the Horseracing Authority is "subject to [the FTC's] pervasive surveillance and authority," revealing that the Authority "operate[s] as an aid to the [FTC]," nothing more.  *Adkins*, 310 U.S. at 388.

Whether the FTC becomes a demanding taskmaster or a lenient one, the FTC *could* subordinate every aspect of the Authority's enforcement "to ensure the fair administration of the Authority . . . or otherwise in furtherance of the purposes of [the] Act."  15 U.S.C. § 3053(e) (as amended).  That potential suffices to defeat a facial challenge, where Oklahoma must show that the Act is unconstitutional in all its applications.  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## C.

In seeking to head off this conclusion, Oklahoma points out that the amendment does not change one feature of the Act—that the FTC has power only to review proposed rules by the Authority for "consistency" with the Act, a standard of review that, it says, does not pick up policy disagreements.  15 U.S.C. § 3053(c).  Maybe so.  But even if that is the case, the FTC's later authority to modify *any* rules for any reason at all, including policy disagreements, ensures that the FTC retains ultimately authority over the implementation of the Horseracing Act.  The FTC's review authority in this respect parallels similar authority exercised by the SEC under the Maloney Act.  *Compare* 15 U.S.C. § 78s(c) (providing that the SEC "may abrogate, add to, and delete from . . . the rules of [the private entity] as the Commission deems necessary or

appropriate"), *with* 15 U.S.C. § 3053(e) (as amended) (providing that the FTC "may abrogate, add to, and modify the rules of the Authority . . . as the Commission finds necessary or appropriate"). The same is true in the Coal Act. *See* Bituminous Coal Act of 1937, Pub. L. No. 75-48, § 4, 50 Stat. 72, 78 (providing that the Coal Commission could "approve, disapprove, or modify" proposals).

Before the amendment, Oklahoma observed that the SEC's modification power gives the SEC "largely unbounded authority to craft [the private entity's] regulations as it sees fit." Reply Br. 7. The same is now true under the Horseracing Act. The lack of a modification power, moreover, was the "key distinction" the Fifth Circuit identified between the Maloney and Horseracing Acts. *Black*, 53 F.4th at 887. The amendment to § 3053(e) eliminates that distinction. Even if other less-material distinctions between the two laws remain, the FTC's new discretion to adopt and modify rules correctly places the private Horseracing Authority in a subordinate position to the public FTC. All of this explains why every court of appeals to address the validity of such delegations under the Maloney Act and the Coal Act, as noted, has upheld them.

Oklahoma worries that the Horseracing Authority's rules could govern a dispute until the FTC undoes rules it dislikes. It's true that the FTC's modification authority under § 3053(e), as it currently exists, customarily would run through ordinary rulemaking. But that current reality need not be a future reality. For one, the threat of modification is not likely to miss the attention of the Authority. For another, the FTC has power to initiate new rules, not just to modify rules it does not like. To the extent this timing gap creates a problem, the FTC is free to resolve it ahead of time. It might, for example, adopt a rule that all newly enacted rules do not take effect for 180 days, thereby giving the FTC time to review rules and prepare preemptive modifications.

This argument overlooks another reality. When the FTC reviews the Horseracing Authority's proposed rules, it asks not just whether they are "consistent" with the Act; it also asks whether they are "consistent" with other "applicable rules approved by the Commission." *Id.* § 3053(c)(2). Any risk of a policymaking gap between initial consistency review and initial full review will diminish over time as the FTC chooses to exercise—or not to exercise—its

complete authority to initiate new rules or modify old ones. Over time, the FTC's threshold consistency review will account for its own full-throated rulemaking power.

Oklahoma notes that the FTC's duty under the Administrative Procedure Act to explain any changes to the rules limits its hand. But that just means it may not arbitrarily alter the rules. The APA does not limit the FTC's authority to disagree with the Horseracing Authority over a policy choice delegated to the agency by Congress. The FTC "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It is enough that "there are good reasons" for the new policy "and that the agency believes it to be better." *Id.*

No matter, Oklahoma adds: The Horseracing Authority's ability to expand its jurisdiction to breeds other than thoroughbreds escapes the FTC's review. Not so. The FTC's § 3053(e) power allows it to revoke the Authority's decision or place procedural and substantive conditions on any such decision.

Oklahoma points to the Horseracing Authority's ability to enforce the Act through civil lawsuits, asserting that the ability cannot reside outside the executive branch. "Difficult and fundamental questions," we agree, arise when private entities enforce federal law. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring). But this is not an as-applied challenge to an individual enforcement action; it is a facial challenge to the Act. The FTC's ultimate authority over all rules promulgated under the Act, which would include any rules related to enforcement, offers a potent answer to this concern in the context of a facial challenge. The Authority's enforcement through internal adjudication and external lawsuits is subordinate to the FTC. The other reality is that the parties simply have not engaged with this feature of the Act, including briefing with respect to founding-era or contemporary analogs showing the role private entities may, and may not, play in law enforcement. That omission is understandable. From the start, Oklahoma litigated this claim as one turning on "governmental oversight" of and "accountability" for the Horseracing Authority's activities, not as a categorical Article II inquiry or as a question of historical meaning. R.53 ¶ 150; R.98 at 23–24. We thus will decide the case as it comes to us, and save resolution of such

questions, if such questions there be, for a day when the Authority's actions and the FTC's oversight appear in concrete detail, presumably in the context of an actual enforcement action.

IV.

Oklahoma separately claims that two provisions of the Horseracing Act, § 3060(b) and § 3052(f), violate the anti-commandeering guarantee of the Tenth Amendment. Oklahoma lacks standing to challenge the first provision, and the second one does not count as a cognizable form of commandeering.

A.

Oklahoma initially sets its sights on § 3060(b), which requires state authorities to "cooperate and share information" with the Horseracing Authority or federal agencies. Right or wrong about whether this requirement amounts to commandeering, Oklahoma and the other State plaintiffs lack standing to challenge it.

Standing arises from the Constitution's mandate that federal courts decide only "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. A plaintiff must establish standing for each claim he presses and each statutory provision he challenges. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207–08 (2021). To do that, he must point to an injury that is traceable to the defendant's conduct and that a judicial decision can redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In a pre-enforcement challenge like this one, a plaintiff must also allege a "credible threat" of future enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

Oklahoma has not carried this burden. Even if Oklahoma is correct that § 3060(b) unlawfully orders the States to cooperate, the provision does not contain a penalty or enforcement mechanism. And Oklahoma does not point to any actual or threatened enforcement actions. An unenforceable statutory duty does not give rise to Article III standing, *California v. Texas*, 141 S. Ct. 2104, 2113–14 (2021), and "mere conjecture" about possible enforcement is not any better, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013).

Oklahoma asserts in response that wrongdoing will "frequently" implicate both federal and state law, and thus trigger the duty to cooperate. R.86 at 10. But the question is not how often the opportunity for cooperation may arise; it is whether the defendants can or will mandate cooperation when that time comes. Even so, Oklahoma notes, the Horseracing Authority may penalize States that refuse to cooperate. But the Authority's sanction power extends only to covered persons, a term that does not include States. 15 U.S.C. §§ 3051(5), 3054(d), 3057(a)(1); *see Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991). The same is true of the Authority's ability to initiate civil lawsuits. 15 U.S.C. § 3054(j).

Absent a credible allegation that the Horseracing Authority or the FTC can or will enforce § 3060(b), Oklahoma lacks standing to challenge it. *California*, 141 S. Ct. at 2115.

B.

Oklahoma separately claims that § 3052(f) puts the States to an unconstitutionally coercive choice. While § 3052(f)'s threat of preemption gives Oklahoma standing, *Kentucky v. Biden*, 23 F.4th 585, 597–601 (6th Cir. 2022), the provision does not commandeer the States.

Congress may not require the States, separate sovereigns all, to implement federal programs. *Printz v. United States*, 521 U.S. 898, 925 (1997). Nor may the federal government issue "orders directly to the States" to carry out this or that federal program. *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018). At the same time, Congress may "encourage a State to regulate" or "hold out incentives" in hopes of "influencing a State's policy choices." *New York v. United States*, 505 U.S. 144, 166 (1992).

One option in this last respect is that Congress may encourage the States through conditional preemption. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 290 (1981). Instead of preempting state law altogether, Congress may offer States a regulatory role contingent on following federal standards. *New York*, 505 U.S. at 167–68. The choice brings consequences. If a State participates, it often has discretion in how it implements the program. *See Hodel*, 452 U.S. at 289. If a State decides not to participate, the State's activities are preempted. By offering States such a non-coercive choice—regulate or be preempted—

Congress has not violated any constitutional imperatives. *Murphy*, 138 S. Ct. at 1479; *New York*, 505 U.S. at 167; *Hodel*, 452 U.S. at 288–91; *FERC v. Mississippi*, 456 U.S. 742, 769 (1982).

That's how § 3052(f) operates. It presents States with a choice, not a command. States may elect to collect fees from the industry and remit the money to the Horseracing Authority or States may refuse. That's their call. If a State participates, it gains discretion over how the fees are collected. 15 U.S.C. § 3052(f)(2)(D). If a State refuses, the Authority collects the fees itself, and the State "shall not impose or collect from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters." *Id.* § 3052(f)(3)(D).

This scheme fits comfortably within the conditional preemption framework. Section 3052(f) "simply establish[es] requirements for continued state activity in an otherwise pre-emptible field." *FERC*, 456 U.S. at 769; *see Printz*, 521 U.S. at 925–26. And because Congress may regulate horseracing under its commerce power, there is nothing unconstitutional about Congress "offer[ing] States the choice of regulating that activity according to federal standards or having state law pre-empted." *New York*, 505 U.S. at 173–74.

Section 3052(f) also lacks the hallmark of commandeering: a "direct" order to the States. *Murphy*, 138 S. Ct. at 1476. Section 3052(f)'s statement that a State "shall not impose or collect" certain fees may sound like a command, true enough. *Id.* § 3052(f)(3)(D). But preemption often carries that tone, as similar language in other statutes confirms. *See, e.g.*, 42 U.S.C. § 7543(a) (1988) ("No State . . . shall adopt or attempt to enforce any standard relating to control of emissions . . . ."); 49 U.S.C. § 40116(b) ("[A] State . . . may not levy or collect a tax [or] fee . . . on an individual traveling in air commerce . . . ."). Because Congress often speaks in this manner, "it is a mistake to be confused" by preemption provisions that "appear to operate directly on the States." *Murphy*, 138 S. Ct. at 1480. Congress in this instance offers the States a choice, as Oklahoma all but concedes. Reply Br. 2, 25, 26, 27 (referring to § 3052(f) as a "threat of preemption"). A choice is not a command. *See Printz*, 521 U.S. at 925–26.

All of this is not to say "that the choice put to the States—that of either abandoning regulation" or assisting the Authority—is an easy one or a good one as a matter of policy.

*FERC*, 456 U.S. at 766. Fraught though it may be, Congress has not commandeered the States by putting them to this choice.

Oklahoma's principal counterargument is that a choice between collecting fees and losing fee collecting authority is illegitimate, coercive, or punitive. We don't think so.

Oklahoma begins by arguing that § 3052(f)'s choice—collect fees for the Horseracing Authority or stop collecting entirely—commandeers the States because Congress may not force the States to adopt either alternative. *See New York*, 505 U.S. at 175–76. Congress may not force a State to collect fees, true. *Printz*, 521 U.S. at 933. But Congress may use its commerce power to preempt the field of horseracing, preventing States from imposing fees. *See FERC*, 456 U.S. at 764; *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). Threatening to do so, it follows, is a "conditional exercise of [a] congressional power." *New York*, 505 U.S. at 176.

Oklahoma's response that a "threat of preemption," Reply Br. 25, is coercive runs aground on contrary precedent. The Court has rejected the argument "that the threat of federal usurpation of their regulatory roles coerces the States." *Hodel*, 452 U.S. at 289; *New York*, 505 U.S. at 176.

Even so, Oklahoma continues, threatening a State's taxing authority is especially coercive. We fail to see how. The validity of conditional preemption does not fluctuate with the power that is threatened. *See Hodel*, 452 U.S. at 290–91. This would not be the first time a State's taxing power was preempted. *See Aloha Airlines, Inc. v. Dir. of Tax'n*, 464 U.S. 7, 14 n.10 (1983); *Exxon Corp. v. Hunt*, 475 U.S. 355, 360–63 (1986).

Oklahoma presses the point that Congress's financial incentives may become so overwhelming that a State effectively cannot refuse. *See South Dakota v. Dole*, 483 U.S. 203, 211–12 (1987). Grafting this principle on conditional preemption raises legal and factual problems. Legally, it is bereft of support; no case evaluates conditional preemption by looking to a State's monetary incentives. Factually, Oklahoma falters because it does not quantify its expected loss. *See NFIB v. Sebelius*, 567 U.S. 519, 580–82 (2012) (opinion of Roberts, C.J.) (comparing an incentive to a State's budget). Without knowing how much money is at stake, how are we to say the sum is too high?

Oklahoma adds that the threat is punitive because it serves no purpose other than to obtain compliance.  Conditional preemption, however, amounts to a "permissible method of encouraging a State to conform to federal policy."  *New York*, 505 U.S. at 168; *see FERC*, 456 U.S. at 766.  And a State that sees itself as a sovereign sometimes must act like one.  Another reason is not difficult to find anyway.  The fee provisions ensure that a single entity—whether a State or the Authority—imposes fees on the horseracing industry for all anti-doping and racetrack safety matters.  Eliminating "double taxation" and fostering uniformity are adequate grounds to preempt parallel collection regimes.  *Aloha Airlines*, 464 U.S. at 9–10; *see Coventry Health Care of Mo., Inc. v. Nevis*, 581 U.S. 87, 97–99 (2017); *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 99 (1992) (plurality).

Oklahoma next argues that Congress failed to "appropriate the funds needed to administer the program" by forcing States to pay for collecting fees even if they refuse to act as the Authority's fee collector.  *Murphy*, 138 S. Ct. at 1477.  Not so.  Private parties pay for the Authority's operations.  15 U.S.C. § 3052(f)(2)(D), (3)(B).  And if a State does not collect fees under the Act, the Authority incurs the cost of doing so.  Even if States suffer a pocket-book loss from preemption, that does not force them to pay for the program.  *See Hodel*, 452 U.S. at 288.

Oklahoma also worries that the scheme blurs accountability.  Conditional preemption, however, leaves a State and its citizens with "the ultimate decision as to whether or not the State will comply."  *New York*, 505 U.S. at 168.  The ability to choose ensures that state and federal entities are accountable for their roles.  *See id.*

We affirm.

————————————

## CONCURRENCE

————————————

COLE, Circuit Judge, concurring.  While I agree with the majority's conclusions that the Act is facially constitutional, and its analysis in full in Part IV, I write separately because I depart slightly from its framing of the issue and its analysis of the private nondelegation doctrine.

## I.  ISSUE ON APPEAL

As a threshold matter, I note what is before us on appeal.  In 2020, with wide bipartisan support, Congress passed, and then-President Trump signed into law, the Horseracing Integrity and Safety Act ("HISA" or "the Act").  Pub. L. No. 116-260, §§ 1201–12, 134 Stat. 1182, 3252–75 (2020) (codified at 15 U.S.C. §§ 3051–60).  Petitioners challenged the Act's constitutionality and appealed the district court's dismissal of the case for failure to state a claim.  A few weeks after this panel heard oral argument in the appeal, Congress amended the Act.  *See* Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 126 Stat. 4459, 5231–32 (2022) (codified as amended at 15 U.S.C. § 3053(e)).  Congress amended section 3053(e), which now provides that:

> The Commission, by rule, in accordance with section 553 of title 5, United States Code, may abrogate, add to, and modify the rules of the Authority promulgated in accordance with this Act as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this Act and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this Act.

15 U.S.C. § 3053(e).  Under the current form of the statute, the Federal Trade Commission ("FTC") can, in certain circumstances delineated in the Act, and through proper rule-making procedures as required by the Administrative Procedure Act, "abrogate, add to, and modify" existing rules promulgated by the Horseracing Integrity and Safety Authority ("Authority").  *Id.*

Today, our review is cabined to the statute as amended, withholding judgment on the previous version or other circuits' handling of the original statute.  To the extent that the cogent majority opinion goes further—opining in dicta that the original statute was unconstitutional—I note that not only does such analysis not carry the force of law, but also that

I disagree, as I believe the original statute was constitutional because the private Authority has always been subordinate to the FTC.

## II.  PRIVATE NONDELEGATION DOCTRINE

The nondelegation doctrines broadly refer to judicially imposed limits on Congress's ability to constitutionally delegate authority to others.  Specifically, Congress cannot delegate its legislative authority to an executive agency unless the statute contains an "intelligible principle" guiding the agency.  *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion); *see also Mistretta v. United States*, 488 U.S. 361, 372 (1989).  This is the public nondelegation doctrine.  The private nondelegation doctrine refers to constitutional concerns that arise where a private entity—rather than a government entity—wields significant power to execute a statutory scheme.  *See Carter v. Carter Coal Co.*, 298 U.S. 238 (1936).  Only the latter of these, private nondelegation, is at issue here.

I agree with the majority that the Act is constitutional under the private nondelegation doctrine, and also that the main test for this issue is whether the private entity is subordinate to the federal agency.  But I write separately because I diverge from the majority's analysis in two ways:  (1) the source of the private nondelegation doctrine, and (2) the precise framing of the private nondelegation question.

### A.  Source of Private Nondelegation Doctrine

The private nondelegation doctrine is rooted in both due process and separation of powers concerns.  Indeed, the earliest invocations of the private nondelegation doctrine arose in the context of local regulations.  *See Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121–22 (1928); *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 530 (1917); *Eubank v. City of Richmond*, 226 U.S. 137, 143–44 (1912).  In these cases, localities granted private homeowners the power to create zoning laws for their neighborhood, and the Supreme Court found these ordinances violated property owners' federal due process rights.  *Eubank*, 226 U.S. at 143–44.  "The Court was concerned that private property owners, with their own interests at stake, had been given total, standardless control over an important aspect of their

neighbors' property." *Rice v. Vill. of Johnstown*, 30 F.4th 584, 589 (6th Cir. 2022) (citing *Eubank*, 226 U.S. at 143).

The separation of powers concerns, meanwhile, stem from the Vesting Clauses, inasmuch as the Constitution vests each of the three branches of government with specific powers and responsibilities. Article I of the Constitution grants Congress legislative power, Article II grants the President executive power, and Article III grants the federal courts judicial power. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy*, 139 S. Ct. at 2123; *see Mistretta*, 488 U.S. at 371 ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government."). Therefore, when a statute confers "the power to regulate the affairs of an unwilling minority" onto a private entity, that "is legislative delegation in its most obnoxious form[.]" *Carter Coal*, 298 U.S. at 311. But when the private entity "operate[s] as an aid to the [agency]" and is "subject to [the agency's] pervasive surveillance and authority, . . . law-making is not entrusted to the [private entity]" and so such a "statutory scheme is unquestionably valid." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940).

Notably, in its federal private nondelegation cases, the Supreme Court has blurred the lines between the two rationales, opting not to definitively root the private nondelegation doctrine in one or the other, and often referring to both. For instance, in *Carter v. Carter Coal*, the first case applying the private nondelegation doctrine to a federal statute, the Court ruled that a portion of the Bituminous Coal Conservation Act of 1935 was unconstitutional under the private nondelegation doctrine. 298 U.S. at 311. In invalidating the statute, the Court found the delegation at issue "so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question." *Id.* at 311–12 (first citing *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); then citing *Eubank*, 226 U.S. at 143; and then citing *Roberge*, 278 U.S. at 121–22).

In so holding, the Court cited two of the zoning cases premised on the due process concerns of the private nondelegation doctrine, and also *Schecter Poultry*, addressing the separation of powers argument. By doing so, the Court maintained the public versus private

division as opposed to a rationale-based division and endorsed both of the rationales underpinning the private nondelegation doctrine. *See Carter Coal*, 298 U.S. at 311.

The Fifth Circuit, when it ruled recently on the original version of the Act, recognized this ambiguity. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 881 n.23 (5th Cir. 2022). "Courts and commentators," it wrote, "differ over the locus of the constitutional violation." *Id.* (citing several articles and cases). *Compare U.S. Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 46 (2014) ("This argument [regarding private nondelegation] rests on the Fifth Amendment Due Process Clause and the constitutional provisions regarding separation of powers."), *with id.* at 87–88 ("[O]ur so-called 'private nondelegation doctrine' flows logically from the three Vesting Clauses.") (Thomas, J., concurring). But the Fifth Circuit concluded it "need not weigh in" to resolve the question at hand. *Black*, 53 F.4th at 881 n.23. "Whatever the constitutional derivation, all parties and the district court agree that the outcome turns on whether the private entity is subordinate to the agency." *Id.*; *see also Ass'n of Am. R.R.s v. U.S. Dep't of Transp.* (*Amtrak I*), 721 F.3d 666, 671 n.3 (D.C. Cir. 2013), *vacated on other grounds*, 575 U.S. 43 (2015) ("While the distinction [between the due process clause and Vesting Clauses] evokes scholarly interest, . . . our own precedent describes the problem as one of unconstitutional delegation."). When presented with the same ambiguity, the D.C. Circuit also did not decide the issue because the doctrine turns on unconstitutional delegation, regardless of its textual roots, and "neither court nor scholar has suggested a change in the label would effect a change in the inquiry." *Amtrak I*, 721 F.3d at 671 n.3.

Moreover, if we root the private nondelegation doctrine solely in separation of powers concerns, we circumvent our own court's private nondelegation doctrine cases—many of which focus on local regulations, not federal ones, and are grounded in due process rights, as opposed to separation of powers principles. *See Rice*, 30 F.4th at 589–91; *Kiser v. Kamdar*, 831 F.3d 784, 791–92 (6th Cir. 2016); *Stevens v. City of Columbus*, No. 21-3755, 2022 WL 2966396, at *9 (6th Cir. July 27, 2022).

Whatever the exact underpinning of the private nondelegation doctrine, what is clear is that the statute is constitutional if the Authority remains subordinate to the FTC. *See Adkins*, 310 U.S. at 388, 399 (holding a statute constitutional where the private entity is "an aid" to the

agency and is "subject" to the agency's "pervasive surveillance and authority"); *Carter Coal*, 298 U.S. at 310–11 (invalidating a statute where private entities were granted the power to establish the maximum hours of labor without any governmental oversight or approval).

That is the beginning and end of the inquiry as to whether a statute is constitutional under the private nondelegation doctrine. The Supreme Court has never suggested that this is the minimum finding, or that subordination on its own may not suffice to withstand a challenge to a statute on private nondelegation grounds. And so the parties could not have framed the appeal in a different way, because the only private nondelegation test is that of subordination.

Now that the framing and source of the nondelegation doctrine is clear, I apply the existing precedent to HISA, finding that HISA as a whole is facially constitutional because the Authority is subordinate to the FTC in several ways.

## B. HISA's Constitutionality

### 1. *Rulemaking Authority*

Oklahoma raises several concerns with the Act and its different components. I agree in full with the majority's discussion of section 3053(e)'s amended text, and its conclusion that the amended text indicates that the Authority remains subordinate to the FTC. I diverge in that I find the rest of the Act to be nearly identical to the previously upheld Maloney Act and Coal Act. I also find that the amended text supports the Authority's subordination but does not alone ensure the Act's constitutionality.

To begin, the Authority does not have independent rulemaking power—only the FTC can promulgate regulations with the force of law:

> A proposed rule or proposed modification to a rule cannot take effect unless approved by the Commission. The Commission is authorized to grant such approval if the proposed rule or modification of a rule is consistent with the requirements in this legislation and any applicable rules approved by the Commission. The Commission is granted the authority to prescribe rules and interim final rules to carry out their responsibilities under this section using the rulemaking process under the Administrative Procedure Act.

H.R. Rep. No. 116-554, at 25 (2020).

Like the private entities in the Maloney Act, known as self-regulatory organizations ("SROs"), and the private entity in *Adkins*, the Authority may only "propose[]" rules to the Commission. 15 U.S.C. § 3053(a). The Authority's rule *cannot* go into effect "unless the proposed rule . . . has been approved by the Commission." *Id.* § 3053(b)(2); *accord Adkins*, 310 U.S. at 388 (upholding statute where boards "propose[d]" prices that only took effect once the agency "fix[ed]" them); 15 U.S.C. § 78s(b)(1) (writing that private entities in the securities arena may "propose[]" rules but, generally, "[n]o proposed rule change shall take effect unless approved by the [SEC]"). Here, a rule only goes into effect once the FTC has approved it, and to approve it, the FTC must first ensure that the rule "is consistent with" HISA and other "applicable rules approved by the [FTC]." 15 U.S.C. § 3053(c)(2).

This consistency review is no mere rubber stamp. The FTC, under the express terms of the Act, must review the Authority's proposed rules to ensure they are consistent with "the safety, welfare, and integrity of covered horses, covered persons, and covered horseraces[.]" *Id.* § 3054(a)(2)(A). There are certain categories of rules for which Congress explicitly laid out clear boundaries for both the Authority and the FTC, and such rules provide "clearly defined policy" for the Authority and FTC to effectuate. (*See* D. Ct. Opinion, R. 105, PageID 1496.) But even for the ones with fewer constraints, all promulgated rules must abide by Congress's explicit imperative to create rules for "the safety, welfare, and integrity" of covered entities. *Id.* § 3054(a)(2)(A). "[T]o the extent HISA affords rulemaking discretion to advance Congress's broader objectives, such as the requirement that safety standards be 'consistent with the humane treatment of covered horses,' the FTC (not the Authority) ultimately exercises that statutorily conferred discretion—all of which is bound up with 'the policy implications of rules proposed.'" (Authority Br. 41 (citations omitted).)

HISA is remarkably similar to the constitutional Maloney Act, and was so even when assessed irrespective of the amendment. The Maloney Act provides the following parameters regarding the SEC's approval of an SRO's rules. The SEC "shall approve"—meaning it *must* approve—a rule "if it finds that such proposed rule change *is consistent with* the requirements of this chapter and the rules and regulations issued under this chapter that are applicable to such organization." 15 U.S.C. § 78s(b)(2)(C)(i) (emphasis added). Likewise, HISA provides that the

FTC "shall approve a proposed rule or modification if the Commission finds that the proposed rule or modification *is consistent with*—(A) this chapter; and (B) applicable rules approved by the Commission." *Id.* § 3053(c)(2) (emphasis added).

Both the Maloney Act and HISA therefore provide for analogous consistency review: the reviewing agency must approve rules that are consistent with both the statute and previously issued rules. The Supreme Court held that the SEC "has broad authority to oversee and to regulate the rules adopted by the SROs" because rules are not enacted "unless the SEC finds that the proposed rule is consistent with the requirements of the Exchange Act, 15 U.S.C. § 78s(b)[.]" *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 233–34 (1987). If that is true for 15 U.S.C. § 78s(b), then that must also be true of 15 U.S.C. § 3053(c)(2).

And neither agency's review of the respective private entity ends there. Each act also provides additional requirements for the consistency review of proposed rules in specific instances. In the Maloney Act, specifically relating to rules proposed by one specific subset of SROs, the SEC's consistency review includes that the rules be "designed[,] . . . in general, to protect investors and the public interest[,]" as well as not be "designed to permit unfair discrimination . . . among participants[.]" *Id.* § 78q-1(b)(3)(F); *see also Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 446 (D.C. Cir. 2017). In the context of another subset of SROs, the SEC must ensure that the proposed rules meet various textual standards, including that they "are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons," and additional standards. 15 U.S.C. § 78f(b)(5).

In HISA, the Authority proposes rules or modifications to rules "relating to" eleven buckets of issues that it then "submits" to the FTC. *Id.* § 3053(a). Some of these include "a list of permitted and prohibited medications"; "standards for racing surface quality maintenance"; and "a description of safety, performance, and anti-doping and medication control rule violations applicable to covered horses and covered persons[.]" *Id.* But in addition to these categories, the Authority may also propose "rule[s], standard[s], or procedure[s] . . . to carry out the horseracing anti-doping and medication control program or the racetrack safety program." *Id.* § 3053(d)(1). For these programs, HISA contains additional requirements and considerations that the FTC

includes as part of its consistency review.  *See, e.g.*, *id.* § 3055(b) (listing seven categories of horse-welfare considerations); *id.* § 3055(g)(3)(b).

Both HISA and the Maloney Act therefore provide for similarly broad consistency review, with additional requirements for specific subsets of rules, such that consistency review on its own can ensure that a private authority remains subordinate to a federal agency.

HISA also matches the aforementioned Coal Act's constitutional agency review of private entities' proposed rules.  The statute, which the Supreme Court upheld as "unquestionably valid," *Adkins*, 310 U.S. at 399, granted the Coal Commission the power to "approve, disapprove, or modify" the private coal boards' "proposed minimum prices *to conform to the requirements* of this subsection," Bituminous Coal Act of 1937, § 4, pt. II(a), 50 Stat. 72, 78 (emphasis added).  Whether providing that the rule must be consistent with a statute, which both the Maloney Act and HISA require, or that the rule must conform to the requirements of a statute, as the Bituminous Coal Act requires, all three statutes properly and constitutionally subordinate the private entity to the federal agency.

And all three statutes provide the agency with independent rulemaking power.  The Maloney Act provides that the SEC "may abrogate, add to, and delete from (hereinafter in this subsection collectively referred to as 'amend') the rules of a[n SRO] . . . as the [SEC] deems necessary or appropriate to insure the fair administration of the [SRO], to conform its rules to requirements of this chapter and the rules and regulations thereunder applicable to such organization, or otherwise in furtherance of the purposes of this chapter[.]"  15 U.S.C. § 78s(c). Such review is textually cabined to "Amendment by Commission of rules of self-regulatory organizations," so it applies only to previously enacted rules, not the SRO's proposed rules or its proposed changes to previously promulgated rules.  *Id.*

Further still, the Maloney Act provides a separate set of requirements for the SEC to approve an SRO's new rule or rule change.  *See id.* § 78s(b).  Under this subsection, the SEC may either "approve or disapprove the propos[al,]" or it may "institute proceedings under subparagraph (B) to determine whether the propos[al] should be disapproved."  *Id.* § 78s(b)(2)(A)(i).  Subparagraph B requires that the SEC "shall provide" the SRO with "notice

of the grounds for disapproval under consideration" and the chance for a hearing on the rule.  *Id.* § 78s(b)(2)(B)(i).  The other portion of subparagraph B makes clear that within the mandated time frame, the SEC must "issue an order approving or disapproving the" proposed rule.  *Id.* § 78s(b)(2)(B)(ii)(I).  Notably missing from these procedures?  The SEC's ability to itself modify an SRO's proposed rule.

The Coal Act also provided the Coal Commission limited modification power.  Much like the review described in the Maloney Act, the Coal Commission's power to modify rules was not all-encompassing:  it could only be done to conform the proposal to the requirements of the statute.  § 4, 50 Stat. at 78.  The importance of this power is that the Coal Commission could ensure that proposed rules that did not align with, or were inconsistent with, the statute's purpose did not become promulgated rules with the power of law.

Both before and after the amendment, the FTC has had, and continues to have, independent rulemaking power.  Prior to the amendment, section 3053(e) provided that the FTC could issue an interim final rule, which carries the power of law, under the standards articulated in the Administrative Procedures Act, 5 U.S.C. § 553(b)(B)—if "necessary to protect" "(1) the health and safety of covered horses; or (2) the integrity of covered horseraces and wagering on those horseraces."  15 U.S.C. § 3053(e) (2020).  5 U.S.C. § 553(b)(B), known as the APA's good-cause provision, allows agencies to issue rules where regular notice-and-comment procedures are "impracticable, unnecessary, or contrary to the public interest."  This section provided the FTC with broad rulemaking power without the need for notice-and-comment rulemaking that could be used beyond the emergency context, such as when notice and comment was "unnecessary"—for example, if there had already been sufficient notice-and-comment procedures regarding various alternative options presented in a proposed rule.  *See* 16 C.F.R. § 1.142(a)(3) (requiring the Authority to include a discussion of "any reasonable alternatives" to the proposed rule and explain why the specific proposal was chosen); *Mobil Oil Corp. v. United States EPA*, 35 F.3d 579, 584 (D.C. Cir. 1994) ("If the original record is still fresh, a new round of notice and comment might be unnecessary."); *Priests for Life v. United States Dep't of Health & Human Servs.*, 772 F.3d 229, 276 (D.C. Cir. 2014) (similar), *vacated on other grounds by Zubik v. Burwell*, 578 U.S. 403 (2016).

Now, with the amendment, the FTC can utilize proper procedures under the APA, including either regular notice-and-comment procedures or the good-cause provision, to "abrogate, add to, and modify the rules of the Authority" whenever the FTC "finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to the requirements of this Act and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this Act." 15 U.S.C. § 3053(3). Just as the Maloney Act and the Coal Act allow the agency to amend the private entity's proposed rules in certain circumstances, so does HISA. Ultimately, none of Oklahoma's arguments regarding the unlawfulness of HISA's rulemaking structure carry substantial weight.

One final note about the private nondelegation doctrine and the cases that have formulated the subordination test. I have noted the numerous ways in which HISA—both with and without the amendment—is nearly identical to the unquestionably constitutional Maloney Act. But even if there are slight differences between the two statutes, no case has ever said that the Maloney Act in its current form is a floor for private nondelegation purposes. In other words, it is not true that a statute must be identical to the Maloney Act, or provide more oversight than the SEC, to be a constitutional delegation. The private entity simply must be subordinate to the agency. The Authority is subordinate to the FTC, and so HISA remains facially constitutional.

### 2. *Enforcement Authority*

Oklahoma also challenges HISA's enforcement structure. The Supreme Court has not ruled on this precise issue, but other circuit courts have relied upon Supreme Court precedent to do so in a way that supports the enforcement structure's constitutionality. Courts' review of the Maloney Act is once again instructive. All circuits that have ruled on the issue have held that the Maloney Act's enforcement scheme is constitutional where, as here, a private entity (the National Association of Securities Dealers ("NASD")) brought enforcement actions against covered entities. *See, e.g.*, *Sorrell v. SEC*, 679 F.2d 1323 (9th Cir. 1982); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690 (3d Cir. 1979), *cert. denied*, 444 U.S. 1074 (1980); *R.H. Johnson & Co. v. SEC*, 198 F.2d 690 (2d Cir. 1952), *cert. denied*, 344 U.S. 855 (1952).

The Second Circuit held that because of "the [SEC's] review of any disciplinary action" taken by the NASD, there is "no merit in the contention that the Act unconstitutionally delegates power to the association." *R.H. Johnson & Co.*, 198 F.2d at 695. The Ninth Circuit, citing to Second and Third Circuit decisions upholding the constitutionality of NASD's enforcement powers, noted that "[petitioner's] claim of unconstitutional delegation appears to rest on his mistaken idea that the SEC does not engage in an independent review of NASD decisions. As we stated in *Sartain v. SEC*, 601 F.2d 1366, 1371 n.2 (9th Cir. 1979), SEC review is de novo." *Sorrell*, 679 F.2d at 1326 n.2. The unanimous principle from the circuit decisions—which the Supreme Court has not disturbed despite repeated opportunities to do so—is that so long as the agency retains de novo review of a private entity's enforcement proceedings, there is no unconstitutional delegation of legislative or executive power, even if the agency does not review the private entity's initial decision to bring an enforcement action. The consistency of this principle reinforces the constitutionality of HISA's enforcement scheme.

In fact, the enforcement scheme in HISA is even more constitutionally sound than that found in the Maloney Act. The Maloney Act was amended in 1975, and, in relation to the enforcement scheme, the amendment may have constrained the SEC's power to review the disciplinary proceedings the NASD pursued. *See Bergen*, 605 F.2d at 697. Nonetheless, this did not change the court's analysis:

> We need not now decide whether this statutory change effects a significant alteration in the SEC's power to review NASD disciplinary proceedings. It suffices to say that to the extent the amendment restricts the SEC's ability to receive additional evidence not presented below, this does not alter our conclusion in Todd [*Todd & Co., Inc. v. SEC*, 557 F.2d 1008 (3d Cir. 1977)] that there is no unconstitutional delegation of legislative authority.

*Bergen*, 605 F.2d at 697. HISA, unlike the Maloney Act, unambiguously empowers the FTC to obtain additional evidence not in the record below and to review the proceeding de novo. *See* 15 U.S.C. § 3058(c)(3)(C). The enforcement scheme in HISA, including two levels of de novo review and allowing the FTC to review evidence not in the record, ensures that HISA is soundly in the company of previously upheld enforcement mechanisms, and is thus not an unconstitutional delegation of power to a private authority.

*          *          *

Although the majority and I take different paths in our analysis, I fully agree that HISA is constitutional under Supreme Court precedent as well as the majority of federal court caselaw.